**In re ESTATE of Frederick M. THOMPSON.**

Supreme Judicial Court of Maine.

Argued Nov. 16, 1979.

Decided May 16, 1980.

Verrill & Dana, Michael T. Healy, Portland (orally), for Abilities & Goodwill, Inc.

Roberts, Shirley & Humphrey, James J. Shirley, Springvale (orally), for intervenor, Waban Projects.

Marden, Dubord, Bernier & Chandler, Alton C. Stevens, Waterville (orally), for Pine Tree Society.

S. James Levis, Jr., Portland, for D. T. Drummond, Jr., Adm'r.

Preti, Flaherty & Beliveau, Joel C. Martin (orally), Arthur A. Peabody, Portland, for Jane Frisbee Holmes.

Before WERNICK, GODFREY, and NICHOLS, JJ., and DUFRESNE, A. R. J.

DUFRESNE, Active Retired Justice.

The four intervenors as potential cy pres beneficiaries of the charitable trust set up in the will of Frederick M. Thompson (testator) and the Attorney General of the State of Maine appeal to the Law Court from a judgment of the Superior Court, Cumberland County, sitting as the Supreme Court of Probate in Equity, to the effect that the Canal National Bank, the plaintiff successor-trustee, shall hold the reference trust as a resulting trust for the benefit of those persons taking by intestate succession under the estate of Frederick M. Thompson. We sustain the appeal, vacate the judgment and remand to the Supreme Court of Probate, for further proceedings consistent with this opinion.

Frederick M. Thompson died in Portland, Maine, on November 24, 1923. After providing for the payment of his just debts, funeral charges and expenses of administration, Thompson gave, bequeathed and devised all the remainder of his estate to his wife, Amelia, for the term of her natural life only, with full power and authority, however, to use all the income and so much or the whole of the principal as she may consider necessary to use for her comfort and welfare, her judgment therein to be final. At her death, Thompson's will formulated the trust which is the subject of

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by Everett P. Ingalls, Portland, (orally), for Sweetser Children's Home.

Jerome S. Matus (orally), Asst. Atty. Gen., Augusta, for Attorney General.

judicial construction in these proceedings. After accumulating the principal and interest for fifty years from his death as directed by the testator, the trustee was to apply the fund in manner as follows:

That a benevolent corporation shall be organized under the laws of the State of Maine, to be known as the Fred Thompson Children's Outing Home, by the then municipal officers of the town of Cape Elizabeth, in the County of Cumberland and State of Maine, together with twelve reputable business and professional men, who shall be residents of said Cape Elizabeth, and appointed for that purpose at the first annual meeting of the town held after the termination of said fifty year period, and I further will and direct that my said trustee, upon receiving proper evidence of the organization of said benevolent corporation, shall deliver and pay over to it all of said funds and property, including all principal and accumulated interest, and I hereby give, bequeath and devise all of said property to said Fred Thompson Children's Outing Home forever, to be used and expended by it, however, as follows:

I direct that said Fred Thompson Children's Outing Home shall acquire a farm of twenty-five acres or more, situated in said Cape Elizabeth, erect suitable buildings thereon, and there maintain throughout each year a nonsectarian home for crippled and other children from five to sixteen years of age, from all parts of New England, cripples to have the preference at all times, and during the summer months of each year, to provide an outing and vacation home for as many children, especially from the larger cities of New England as it may be possible to care for. I direct that said corporation shall have the sole control and authority over said home and it is the object and purpose of the donor of this fund that said home be maintained so as to provide comfort, cleanliness and order, and with the fixed purpose to make brighter and more cheerful the lives of children in the midst of all of the home atmosphere it is possible to create.

Amelia K. Thompson, the testator's widow and life beneficiary under his will, died on November 22, 1946. Canal National Bank qualified as trustee and has been holding the trust assets as directed in the will.

By amended complaint dated June 6, 1975, the trustee sought instructions from the Probate Court under its jurisdiction in equity (4 M.R.S.A. § 252) respecting the manner in which the Thompson trust fund should be applied. The complaint alleges, and all parties stipulated, that in June of 1975 the current total value of the trust assets was in the approximate amount of $88,000.00 and that on September 23, 1974 the municipal officers of Cape Elizabeth had voted unanimously not to organize the corporation to be known as the Fred Thompson Children's Outing Home as directed in Thompson's will and had declined to do so on the ground that the assets of the trust were inadequate to carry out the testator's specific benevolent purpose. The trustee bank brought in, as parties defendants, the Attorney General of the State of Maine, the administrator d.b.n.c.t.a. of the estate of Frederick M. Thompson, as well as the respective fiduciaries of estates of deceased heirs or next of kin of Mr. Thompson. Jane Frisbie Holmes intervened as an heir, as did four charitable organizations, to wit: Abilities of Goodwill, Inc., Pine Tree Society for Crippled Children and Adults, Inc., Sweetser-Children's Home, and Waban Projects, Inc.

The case was presented to the Probate Court sitting in Equity, as well as to the Supreme Court of Probate sitting in Equity, on an agreed statement of facts and documentary evidence. The charities, supported by the Attorney General, pleaded for the application of the cy pres doctrine. The manner in which the individual charities respectively proposed to use the funds and carry out, as near as possible, the charitable purpose expressed in the Thompson will was fully argued and urged upon the courts. Holmes and the fiduciary defendants disagreed and do presently press their contention that the Thompson trust failed

completely, because, in setting up the trust for the Children's Outing Home, Frederick M. Thompson did not attest to a general charitable intent.

There is no dispute that the testator's dream of the Children's Outing Home as conceived by him in his will is unattainable because of insufficiency of the trust assets, and the critical issue throughout this litigation was, and is, whether the trust wholly fails, because it was a specific benevolent project to which the testator committed himself exclusively, or whether the will evinces in the testator that general charitable intent which will save a charitable trust that cannot be carried out in the particular manner indicated in the trust document and permit an alternative method of execution to be effected, as close as possible to the testator's original design.

In the Probate Court, the Judge found that the bequest creating the charitable trust demonstrated a general charitable intent. He applied the cy pres doctrine and instructed the trustee, after payment of necessary expenses and reasonable counsel fees out of the trust estate, to distribute the trust assets in equal shares free of trust to the four intervening charities. Holmes and the several fiduciaries representing the heirs and next of kin of Frederick M. Thompson appealed that decision to the Superior Court sitting as the Supreme Court of Probate, on the stated reasons that the testator did not have a general charitable intent and that, even if the doctrine of cy pres were applicable, the plans of the charities as disclosed were not alternatives which would accommodate the testator's expressed intent but rather would frustrate the same.

The Superior Court sitting as the Supreme Court of Probate ruled that the doctrine of cy pres was not applicable and, under such circumstances, the trustee bank was holding the trust estate created by the will of Frederick M. Thompson as a resulting trust for the benefit of the heirs at law of Mr. Thompson. The basis for the Justice's ruling is contained in the following paragraph of his decision:

In the instant case the very specificity of the language and purpose of the Testator evidenced his attachment to the very specific purpose described in his will and the accomplishment of that purpose by the very specific means enumerated. There is nothing in the language to evidence a general charitable intention.

We disagree with the Justice in his conclusion that the Thompson will did not exemplify a general charitable intent on the part of the testator.

■ Initially, we may state that the "clearly erroneous" standard of review does not apply in this case, since the evidence before the Supreme Court of Probate consisted of an agreed statement of facts and documentary exhibits. In such circumstances, we are free to evaluate the evidence, without reference to the findings below, in determining whether the facts justify the application of the cy pres doctrine. *In re Edwards' Estate*, 161 Me. 141, 210 A.2d 17 (1965). See also *Pappas v. Stacey*, 151 Me. 36, 116 A.2d 497 (1955), appeal dismissed 350 U.S. 870, 76 S.Ct. 117, 100 L.Ed. 770.

■ The doctrine of *cy pres* may be explained as a judicial principle for the preservation of a charitable trust when the accomplishment of the particular purpose of the trust is or becomes impossible, impractical or illegal. In such a situation, if the creator of the trust manifested in the trust instrument what has been termed by the courts a general charitable intent, i. e. an intent to devote the trust to a charitable purpose more general than the frustrated purpose, a court of equity, instead of allowing the trust to fail, will apply the trust funds *cy pres*, i. e. to a charitable purpose as nearly as possible to the particular purpose of the settlor or testator.

This Court, in *Pierce v. How*, 153 Me. 180, at p. 189, 136 A.2d 510, at p. 515 (1957), quoted with approval the following statement from Scott on Trusts, Vol. 3, § 399:

"Where property is given in trust for a particular charitable purpose, the trust will not ordinarily fail even though it is

impossible to carry out the particular purpose. In such a case the court will ordinarily direct that the property be applied to a similar charitable purpose. The theory is that the testator would have desired that the property be so applied if he had realized that it would be impossible to carry out the particular purpose. The theory is that although the testator intended that the property should be applied to the particular charitable purpose named by him, yet he had a more general intention to devote the property to charitable purposes. The settlor would presumably have desired that the property should be applied to purposes as nearly as may be like the purposes stated by him rather than that the trust should fail altogether. The principle under which the courts thus attempt to save a charitable trust from failure by carrying out the more general purpose of the testator and carrying out approximately though not exactly his more specific intent is called the doctrine of cy pres."

See also Restatement, Trusts, Vol. II, § 399 (1935).

■ Before the cy pres doctrine can be applied, three prerequisites must be met. First, the court must find that the gift creates a valid charitable trust; second, it must be established that it is impossible or impractical to carry out the specific purpose of the trust;[1] and thirdly, the court must determine whether, in creating the charitable trust, the testator or settlor had a general charitable intent. *First Portland National Bank v. Kaler-Vaill Memorial Home*, 155 Me. 50, 67, 151 A.2d 708, 717 (1959); *Pierce v. How, supra*. In the instant case, the only issue in litigation is the third criterion, i. e. whether the Thompson will carries within itself evidence of the existence of a general charitable intent in the mind of the creator of the trust, here the testator.

This requirement necessitating the finding of a general charitable intent from the trust document grew up as a result of the theory that the cy pres doctrine is a device to carry out the intent of the creator of the trust. *Pierce v. How, supra*. In *Howard Savings Institution of Newark v. Peep*, 34 N.J. 494, 170 A.2d 39, 42–43 (1961), the New Jersey Court made the following observations as an aid to the application of the doctrine of cy pres in that case:

"First, the term 'general charitable intent' ordinarily used by courts articulating the doctrine does not require an intention to benefit charity generally. It requires only a charitable purpose which is broader than the particular purpose the effectuation of which is impossible, impracticable or illegal. Sheridan & Delaney, The Cy-Pres Doctrine (1959); Restatement, Trusts § 399, comment c, p. 1211 (1935). Second, the inquiry 'did the settlor manifest a general charitable intent' is just another way of asking 'would he have wanted the trust funds devoted to a like charitable purpose, or would he have wanted them withdrawn from charitable channels.' 4 Scott, Trusts § 399, p. 2824 (1956). So stated, it can be seen that *cy pres* is an intent-enforcing doctrine. But it is well to keep in mind that it is a surmise rather than an actual intent which the courts enforce through application of the doctrine. Rarely does a settlor contemplate the possible nonfulfillment of his precise purpose. Therefore, the court must make an educated guess based on the trust instrument and relevant extrinsic evidence as to what he would have intended had he been aware of the contingency which has frustrated the exact effectuation of his expressed intent. 2A Bogert, Trusts & Trustees § 436, p. 344 (1953)."

In *Ramsey v. City of Brookfield*, 361 Mo. 857, 237 S.W.2d 143 (1951), at pp. 145–146, the Missouri Court particularized further the concept of "general charitable intent."

"A 'general charitable intent' is not limited to intent to do 'charity in general.' There are many kinds of charities. Restatement, Trusts, Sec. 368, p. 1140; and 10 Am.Jur., Charities, Sec. 52, p. 621.

---

1. For the distinction between the doctrine of cy pres and the doctrine of deviation, see *In re* *Estate of Rood*, 41 Mich.App. 405, 200 N.W.2d 728, at p. 735, n. 7 (1972).

A general charitable intent exists in any case where there is an intent to assist a certain general type or kind of charity. If such intent exists, any means specified by the settlor is deemed his preference for dispensing the general kind of charity he has chosen to aid. And such a general charitable intent is negatived only where it is determined that the settlor's intent was to aid that kind of charity *only* in a particular way or by a particular method or means, that he intended to make no gift to that general kind of charity other than by the specified particular means, that he intended that, if the specified particular means failed, the gift failed, and that the corpus of the trust estate could no longer be used for the general type or kind of charity he desired to assist. 2 Bogert, Trusts, Sec. 436, p. 1307; 3 Scott, Trusts, Sec. 399, p. 2098. See 10 Am.Jur., Charities, Sec. 127, p. 678; Restatement, Trusts, Sec. 399, p. 1208."

■ Thus, whether or not Frederick M. Thompson in the testamentary disposition of his property evinced a general charitable intent or, as otherwise stated, showed an intent to devote the subject matter of his gift to charitable purposes generally as hereinbefore mentioned, is a question of interpreting the will of the testator. Such intent must be discovered within the four corners of the instrument being construed, read in the light of the surrounding applicable circumstances. *First Universalist Society of Bath v. Swett,* 148 Me. 142, 149, 90 A.2d 812, 816 (1952); *Lockwood v. Killian,* 172 Conn. 496, 375 A.2d 998 (1977); *Town of Brookline v. Barnes,* 324 Mass. 632, 87 N.E.2d 843, 846 (1949).

■ It is the duty of this Court in the posture in which this case is presented to determine whether the instant testamentary bequest manifests in the testator a probable general charitable intent. Courts can only deal in probabilities where intent is in question, and, in the case of doubt or ambiguity, evidence outside the will may be used to assist in finding the probable intention. *Bar Harbor Banking & Trust Co. v. Preachers' Aid Society of Methodist Church,* Me., 244 A.2d 558, 562 (1968).

In view of that fact, previous judicial decisions involving interpretation of wills lack authority usually accorded to precedents. While they can afford helpful analogies, they are uncertain guides. As stated in *Perry v. Leslie,* 124 Me. 93, 98, 126 A. 340, 343 (1924): "No two wills are ever precisely alike. No two testators are situated precisely the same, and it is both unsafe and unjust to interpret the will of one man by the dubious light of the construction given by a court of justice to the will of another." See also *Iozapavichus v. Fournier,* Me., 308 A.2d 573, 575 (1973); *Maine National Bank v. Petrlik,* Me., 283 A.2d 660, 664–665 (1971).

■ Canons of construction, otherwise termed presumptions, may be resorted to and indulged in merely as judicial aids in the ascertainment of intent. They must depend for use and application in any particular case upon the respective factual settings in which they are expected to operate. They are not per se controlling, but their force will hinge on the degree of illumination which they may help to cast on the determination of the true intent of the testator. *Bar Harbor Banking & Trust Co. v. Preachers' Aid Society of Methodist Church, supra.*

■ In final analysis, it is the intention of the testator which, when clearly manifest, must prevail over technical rules of construction. *Hiller v. Loring,* 126 Me. 78, 80, 136 A. 350 (1927); *Belding v. Coward,* 125 Me. 305, 308, 133 A. 689 (1926); *Bradbury v. Jackson,* 97 Me. 449, 455, 54 A. 1068 (1903).

■ These rules of construction, although not conclusive provide us with factors to be considered in our analysis of the Thompson will. In determining whether the testator had a general charitable intent as distinguished from an exclusive specific charitable purpose, the following canons of interpretation come to mind.

First, we must construe the testator's will so as to avoid intestacy if at all possible. The presumption exists that a testator does

not intend that any part of his estate shall pass by intestacy. *Iozapavichus v. Fournier, supra; Dow v. Atwood,* Me., 260 A.2d 437 (1969); *In re Edwards' Estate,* 161 Me. 141, 210 A.2d 17 (1965).

Second, the absence of a reverter clause or gift over in the event that the particular purpose fails is evidence of a general charitable intent. *In re Estate of Lamb,* 19 Cal.App.3d 859, 868, 97 Cal.Rptr. 46, 51 (1971); *Ball v. Hall,* 129 Vt. 200, 274 A.2d 516, 522 (1971); *Town of Brookline v. Barnes,* 324 Mass. 632, 87 N.E.2d 843, 846 (1949).

Third, a general charitable intent may be implied where the will disposes of the testator's property mostly or solely for charitable purposes. *Pierce v. How, supra; Miller v. Mercantile-Safe Deposit and Trust Co.,* 224 Md. 380, 168 A.2d 184, 189 (1961). In the instant case, except for the testamentary provisions providing for the comfort and welfare of his widow during her lifetime, the testator's intentions were solely directed towards charity.

Fourth, similarly, the failure to provide for next of kin in a will in which, except for his widow, the testator devotes his whole estate to charity, may be taken as some indication of a general charitable intent.

Fifth, we must make this determination, having in mind the special favoritism which the law has toward a charitable gift or trust. *Robert W. Traip Academy v. Staples,* Me., 317 A.2d 816, 819 (1974); *Grigson v. Harding,* 154 Me. 146, 150, 144 A.2d 870, 873 (1958); *Prime v. Harmon,* 120 Me. 299, 303, 113 A. 738, 740 (1921).

█ Notwithstanding, however, the sympathetic interest of courts of equity in charitable bequests and their use of a liberal construction standard in the application of the cy pres doctrine, this Court must not make a new will for the testator under the guise of interpreting it, although it might appear to the court that another worthy and deserving object of charity should, by substitution, be made the recipient of the testator's bounty in accordance with its own notions respecting the suitability of the bequest. Absent a manifestation in the will of a general charitable intent on the part of the testator, the court is without authority to exercise its equitable powers to execute the testator's charity by way of the cy pres doctrine. See *Babb v. Rand,* Me., 345 A.2d 496, 498 (1975); *Barnard v. Linekin,* 151 Me. 283, 288, 118 A.2d 327, 329 (1955); *Cady v. Tuttle,* 127 Me. 104, 107, 141 A. 188 (1928).

With the reference caveat in mind and taking the above canons of construction into consideration, we do find that Frederick M. Thompson did express in his will a general charitable intent. When he added at the end of his detailed charitable scheme—

> and it is the object and purpose of the donor of this fund that said home be maintained so as to provide comfort, cleanliness and order, and with the fixed purpose to make brighter and more cheerful the lives of children in the midst of all of the home atmosphere it is possible to create,

he was highlighting the basic and overriding general intention underlying his benevolent gift as particularized by focusing specifically upon the prospective end result of his charity, such as bringing to the children of the larger cities of New England the comforts and homey atmosphere of a real home, with special emphasis placed upon his declared desire that crippled children be preferred. The record shows that his wife Amelia had shown interest in such type of benevolent endeavor as a member and director of the Maine Home for Friendless Boys, a civil activity which we can infer had the active support of her husband. The testator's specific directions for the establishment and maintenance in Cape Elizabeth of the home he described in the will as the manner in which his general charitable purpose would be carried out were not stated to be a condition precedent or an essential prerequisite of his charitable gift. The prospective location of the home in Cape Elizabeth cannot be viewed essential to his charitable project, as there is no evidence that the testator was particularly or sentimentally attached to any specific location. The general purpose of the testator was to

provide the comforts of home to young crippled children and such others as may not enjoy such benefits in our cosmopolitan areas. He certainly did not intend to confer upon the Town of Cape Elizabeth any particular gain other than what might accrue from the location there of the intended project that his scheme contemplated. By making the children of our larger cities in New England the beneficiaries of his gift, Thompson removed from his benevolent plan the idea of a purely local institution. His primary concern was not the home structure itself; rather it was his purpose to benefit that class of young people who through misfortune of one kind or another could be classified as crippled children, as well as those in our large centers of population in New England who could profit from a real home atmosphere. *Manufacturers National Bank v. Woodward*, 141 Me. 28, 38 A.2d 657 (1944).

Furthermore, the testator's directive that the Children's Outing Home he visualized in his benevolent scheme be known as the Fred Thompson Children's Outing Home seems to indicate a desire on his part that the charitable institution intended to administer the trust be a memorial to his father as a rehabilitative gesture on account of his tragic and penniless death, if not as a memorial to himself. This commemorative purpose in itself has some special force in determining the existence of a general charitable intent. Any such objective, accompanied with the overriding purpose to benefit crippled children as a class, tends to strengthen the inference that the testator, as a means of ensuring the perpetual existence of the memorial, would prefer that his general charitable intent be carried into effect even though it be done in a way different from the particular mode he had chosen, rather than have his charitable gift fail altogether. The failure of the charity would entail failure of the memorial as well. *State v. Rand*, Me., 366 A.2d 183, 199 (1976). See also *Rogers v. Attorney General*, 347 Mass. 126, 196 N.E.2d 855 (1964); *Citizens & Manufacturers Nat. Bank v. Guilbert*, 121 Conn. 520, 186 A. 564 (1936).

█ Absent the specific home structure contemplated by the testator, some scheme may be devised in connection with the fund that will serve, in some appropriate and practical manner, to publish the fact that the charity is in memory of Fred Thompson. See *Rogers v. Attorney General, supra*, 196 N.E.2d at p. 861; *Traip Academy v. Staples*, Me., 317 A.2d 816, 822 (1974).

█ In ascertaining the existence of a general charitable intent, the court must determine whether the testator would have wanted the trust funds to be devoted to a charitable purpose similar to, but not exactly the same, as he provided in the will or to go to his next of kin by intestacy. Our analysis of the Thompson will compels us to conclude that he would have intended the execution of his charitable purpose in a manner different from the exact method of accomplishment he had detailed in order to save the charitable disposition he had made. See *Howard Savings Institution of Newark v. Peep*, 34 N.J. 494, 170 A.2d 39 (1961). Thus, the Thompson will manifested a general charitable intent on the part of the testator and the doctrine of cy pres was applicable.

The remaining problem is to find an alternative charitable object which will meet with the testator's declared intent, at least as nearly as possible as can be. As stated in *Lynch, Trustee v. Congregational Parish*, 109 Me. 32, at 38, 82 A. 432 (1912):

> "To apply the doctrine, the court must be satisfied that some other object may be found answering the intention of the donor in a reasonable degree, and most nearly consonant to the donor's general charitable purpose."

The Probate Court ordered cy pres distribution to the four intervening charities in equal shares, with no regulations on use incorporated into the order.

The Attorney General and the charities have argued that, once this Court has decided that the doctrine of cy pres applies, our remand should affirm the Probate Court distribution on the ground that the heirs at law or next of kin of Frederick M. Thompson or their representatives have no stand-

ing to appeal from an order of distribution cy pres. We need not decide this issue of standing in the narrow setting in which it is presented.[2]

In their appeal to the Supreme Court of Probate, the heirs at law or next of kin of Frederick M. Thompson or their legal representatives have raised and argued two issues before that Court: first, the non-applicability of the doctrine of cy pres, and, second, if the doctrine be applicable, none of the potential cy pres takers to whom distribution was ordered in the Probate Court, either singly or in the aggregate, offers a charitable operative scheme sufficiently near the testator's specific design so as to save his intent from complete frustration, and, thus, under such circumstances, the testator's charitable disposition of his estate must fail and lapse in any event. Being "persons aggrieved" by the Probate Court's order, they had the right to have both issues resolved in the Supreme Court of Probate. See *Matter of Lappie*, Me., 377 A.2d 441 (1977).

The Supreme Court of Probate did not adjudicate upon this second issue, and this Court should not sua sponte decide a point which the court below has failed to entertain and settle. See *Jones v. Suhre*, Me., 345 A.2d 515 (1975). Where, by deciding that the doctrine of cy pres was not applicable, the Justice below had no occasion to, and did not rule on, the propriety of the Probate Court's distributive order and judgment which purported to implement the testator's intent in a substitute manner as close as possible to the testator's intended charitable scheme, the case should be remanded to the Supreme Court of Probate for a determination of that question. See *Rounds v. Basham*, 116 Me. 199, 201, 100 A. 936 (1917); *Vassar v. Vassar*, 142 Me. 150, 153, 48 A.2d 620, 621 (1946); *Modjeska Sign Studios, Inc. v. Berle*, 43 N.Y.2d 468, 402 N.Y.S.2d 359, 373 N.E.2d 255, 262–263 (1977).

We recognize that the Attorney General, as the chief law officer of the State, has the power and duty to institute, conduct and maintain such actions and proceedings as he deems necessary for the protection of public rights and to defend against any action that might invidiously interfere with the same. *Lund ex rel. Wilbur v. Pratt*, Me., 308 A.2d 554, 558 (1973). In respect to charitable trusts, the Attorney General's duty to protect the community interest in their enforcement is not only derived from the common law, but is imposed by legislative mandate. 5 M.R.S.A. § 194. See *Fitzgerald v. Baxter State Park Authority*, Me., 385 A.2d 189 (1978).

While the Attorney General may consent to cy pres distribution to one particular charitable institution or recommend more than one in his approach to seek the charity that will most closely relate to the testator's charitable purpose, nevertheless, neither his consent nor his recommendation is binding upon the court upon whom the ultimate responsibility for the proper application of cy pres rests. *Veterans' Industries, Inc., of Long Beach, Cal. v. Lynch*, 8 Cal.App.3d 902, 88 Cal.Rptr. 303 (1970); *Lockwood v. Killian*, 172 Conn. 496, 375 A.2d 998 (1977); *Matter of Estate of Coleman*, 2 Kan.App. 567, 584 P.2d 1255 (1978).

We repeat the statement in *Lynch, Trustee v. Congregational Parish*, 109 Me. 32, at p. 38, 82 A. 432 (1912):

"To apply the doctrine, the court must be satisfied that some other object may be found answering the intention of the donor in a reasonable degree, and most nearly consonant to the donor's general charitable purpose."

The purpose of cy pres is to effectuate the intent of the testator in a modified manner; the selection of a substitute plan must be designed to effectuate that intent. *Nelson v. Kring*, 225 Kan. 499, 592 P.2d 438 (1979). See generally Bogert, Trusts & Trustees § 442 (2nd ed. 1977).

The Supreme Court of Probate did not rule on this issue that was properly before

---

**2.** Since the appeal of the Attorney General is being sustained, we express no opinion on the standing of the several charities to appeal from

the decision of the Supreme Court of Probate. Even if we assume standing, their appeal would be mooted as a matter of fact.

it and it should do so in the discharge of the duty imposed upon it to satisfy itself that the testator's general charitable intent will be carried out to the closest degree as can be. In so doing, it shall have to decide whether the distribution to the four charities as ordered by the Probate Court, instead of limiting the same to a lesser number of charities, does enhance the accomplishment of the testator's goal, if it does find that some of the charities would qualify for the execution of the trust cy pres.[3] In addition, the Supreme Court of Probate should consider, whether the distribution order to any charity should include regulations on use of the funds.

The entry will be:

Appeal sustained.

Consolidated judgment of the Superior Court sitting as the Supreme Court of Probate in Equity is vacated.

Costs and reasonable fees to counsel for the several parties to this appeal to be fixed by the sitting justice below and ordered paid by the Trustee and charged in its probate account.

Remanded to the Superior Court sitting as the Supreme Court of Probate in Equity for further proceedings consistent with the opinion herein.

---

**3.** We do not intimate any opinion respecting multiple distribution under the cy pres doctrine. See *Lynch, Trustee v. Congregational* *Parish*, 109 Me. 32, 82 A. 432 (1912); *In re Estate of Kay*, 456 Pa. 43, 317 A.2d 193 (1974).