NORWAY NATIONAL BANK, Trustee
u/w/o Emma L. Chapman

v.

Irene C. OATES et al.

Supreme Judicial Court of Maine.

Dec. 12, 1972.

Pierce, Atwood, Scribner, Allen & McKusick, by Jotham D. Pierce, Sigrid E. Tompkins, Portland, Maine, for plaintiff.

Bernstein, Shur, Sawyer & Nelson, by Leonard M. Nelson, Peter J. Rubin, Gregory A. Tselikis, Linnell, Perkins, Thompson, Hinckley, Thaxter & Keddy, by Sidney W. Thaxter, Owen W. Wells, Portland, Gordon M. Stewart, South Paris, Jensen, Baird, Chapman & Gardner, by Raymond E. Jensen, Portland, for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

POMEROY, Justice.

By appropriate pleadings, we are asked, on report, pursuant to Rule 72(a) M.R. Civ.P. to construe the last Will and Testament (with two codicils thereto) of the late Emma L. Chapman.

This litigation originated in 1954 with the filing of a Bill in Equity requesting the construction of both the Will of William R. Chapman and that of Emma L. Chapman, with the codicils thereto; each of

said Wills and codicils have been duly admitted to Probate.

On November 14, 1944, after providing for specific legacies, Emma L. Chapman bequeathed and devised the remainder of her estate to trustees for the use and benefit of her daughter, Cornelia B. Chapman. Such was the direction found in Article Seventh of her Will.

Article Eighth of the Will provided:

"After the death of the beneficiary named in the preceding paragraph of this Will, I hereby authorize and instruct my aforesaid Trustees to distribute the remainder of the Trust Fund in its entirety, capital and interest accumulations as well, to my heirs-at-law then living, in order of their right of representation, per stirpes."

In the First Codicil, dated March 20, 1946, Mrs. Chapman provided:

"In accordance with the last Will of W. R. Chapman—and confirming his statement—I desire that *all things connected* with the *home place, house, garage and their furnishings,* should be left, *as is,* for the use of Cornelia B. ('Dimple') his daughter and Alice Capen as a *home,* as long as they both so desire. I would like Alice and her sister, Minnie, to remain and care for the house and its contents, as they now do—I would like Judkins to remain and look after the house and Estate, rentals, etc. —I want the automobile, my property, to be left for their use, and all useful things about the place kept as they now are, for these two faithful helpers, as long as they live and desire to stay there. Should they separate, each one is to have a chamber *bedroom set* of furniture and the fittings that they need to furnish a room for each one.

"It is my desire that the place be kept as a Home for these faithful helpers and my daughter, Cornelia B. ('Dimple'); my sisters to come as they please in the summer-time as visitors.

"When *all* is *over,* the entire Estate can be sold and the receipts divided between Mr. Chapman's relatives and mine pro-rata, but nothing is to be taken from the house until such time as suitable fair division is made—after Cornelia B. ('Dimple') and Alice have both finished with it.

"My personal property I will leave marked for those to whom it should be sent—after 'my death; I do not want controversy and squabbling over my clothing and jewelry." (Emphasis in original.)

Mrs. Chapman died on August 9, 1950. The death of her daughter, Cornelia B. Chapman, followed on May 23, 1954.

In the 1954 proceeding the trustee of William R. Chapman and the co-trustees of Emma L. Chapman prayed that the Court would determine:

(1) Whether said Alice M. Capen has a life estate in said homestead in Bethel, under the will of said William R. Chapman.

(2) Whether the estate of said Emma L. Chapman is charged with the maintenance of said homestead for and during the term of the natural life of said Alice M. Capen.

(3) To whom the remainder of the estate of William R. Chapman is distributable if the trust created under his will has now terminated.

(4) To whom the remainder of the estate of Emma L. Chapman is distributable if the trust created under her will has now terminated.

(5) And that the plaintiff may have such other and further relief as the nature of the case may require.

In framing the issues in the decree, the presiding Justice stated: "The questions for determination are:

1. Whether or not Alice M. Capen has a life estate in the residence formerly

belonging to the said William R. Chapman, situated in Bethel, Maine?

2. Whether or not the Estate of Emma L. Chapman is charged with the maintenance of said homestead, formerly of William R. Chapman, in Bethel, Maine, for the benefit of said Alice M. Capen during her life?

3. If the said Alice M. Capen has a life estate in the homestead of William R. Chapman, in Bethel, Maine, under the latter's will, to whom is the remainder of the estate of William R. Chapman distributable upon the death of Alice M. Capen?

4. If the said Alice M. Capen does not have a life estate in the homestead of William R. Chapman, in Bethel, Maine, under the latter's will, to whom is the remainder of the estate of said William R. Chapman distributable?

5. If the estate of Emma L. Chapman is charged with the maintenance of said homestead, formerly of William R. Chapman, in Bethel, Maine, for the benefit of said Alice M. Capen during her life, to whom is the remainder of the estate of said Emma L. Chapman distributable upon the death of said Alice M. Capen?

6. If the estate of Emma L. Chapman is not charged with the maintenance of said homestead, formerly of William R. Chapman, in Bethel, Maine, for the benefit of said Alice M. Capen during her lifetime, to whom is the remainder of the estate of said Emma L. Chapman now distributable?"

The then presiding Justice determined that the only asset remaining in the trust created by the Will of William R. Chapman was the "homestead" in Bethel, Maine; that this homestead was to be used as a home for Alice M. Capen during her life or that the proceeds from the disposal of this homestead be used for the support of Alice M. Capen; and that the trust be divided among his heirs and the heirs of Emma L. Chapman to be determined as of the death of Alice M. Capen.[1]

The Court next decided that by the First Codicil to her Will, Emma L. Chapman intended that her estate be held in trust to preserve the homestead in Bethel as a home for Alice M. Capen and to provide sustenance to Alice M. Capen during her life. As to the persons to whom distribution was to be made the Justice ruled:

"It is therefore ordered that upon the death of Alice M. Capen, the remainder of the estate of Emma L. Chapman shall be distributed among the legal heirs of William R. Chapman and Emma L. Chapman living and determined as of the time of death of Alice M. Capen, according to the rules of descent of the State of Maine."

Alice M. Capen died on May 26, 1969.[2] The trustee u/w/o Emma L. Chapman then instituted the present action to determine the binding effect of the 1954 judgment and to be instructed by the Court as to the manner of distribution of the estate of Emma L. Chapman.

This matter comes before the Law Court on the request of all parties appearing below and the certification of the Justice below under Rule 72(a) M.R.C.P., upon the complaint, answers and so much of the evidence adduced before the single Justice as is legally admissible, that this Court may render such decision as the rights of the parties require.

The ultimate issue is whether the remainder of the estate of Emma L. Chap-

---

1. The distribution of the trust created by William R. Chapman is not contested. The construction of Mr. Chapman's Will is, however, helpful inasmuch as it relates to the testamentary plan of Emma L. Chapman.

2. Minnie A. Capen and Clarence W. Judkins, named in the First Codicil to the Will of Emma L. Chapman and therefore potential life beneficiaries, both predeceased Alice M. Capen.

man passes under Article Eighth of her Will, to "my heirs-at-law then living, in order of their right of representation, per stirpes" or under the First Codicil to her Will, to be "divided between Mr. Chapman's relatives and mine pro rata." The Justice in the 1954 action decided the latter.

From the third and fifth issues posed in the 1954 proceeding it is evident that the Justice faced the issue of whether Article Eighth of her Will or the First Codicil to her Will was to control the distribution of the estate of Emma L. Chapman. The 1954 decision was obviously reached by reading the Will and Codicil together in order to ascertain Mrs. Chapman's intent. That Court held:

" . . . the remainder of the estate of Emma L. Chapman shall be distributed *among the legal heirs of William R. Chapman and Emma L. Chapman* . . . . " (Emphasis added.)

By ordering distribution to the heirs of both William and Emma Chapman it is clear to us that the Justice found the First Codicil to be the controlling declaration of the dispositive intent of Emma L. Chapman.

█ The first issue before this Court is the binding effect of the 1954 decision. We hold that part of the decision providing for the disposition of the estate of Emma L. Chapman upon the termination of the life estate granted to Alice M. Capen not to be *res adjudicata.*

It can be seen from a comparison of the prayer and the issues set forth by the Justice in his 1954 decree that issue number five was not specifically raised by the pleadings. The final prayer of the Bill, a general prayer for "other and further relief as the nature of the case may require," cannot be held to raise the issue of the distribution of Emma L. Chapman's estate upon the termination of the life estate. The general prayer must be held to apply only to those questions essential to the granting of relief specifically set out in the Bill, i. e., whether a life estate has been created and the distribution of the estate if a life estate was not created.

In Loggie v. Chandler, 95 Me. 220, 223, 49 A. 1059, 1060 (1901), this Court stated that

"The prayer for relief is as essential a part of a bill in equity as is the statement of facts. The Court cannot go beyond the one any more than the other. *The respondent need not anticipate a decree that is not asked for.*" (Emphasis added.)

The contingent remaindermen under the Will of Emma L. Chapman need not have anticipated that their interests would be adjudicated in the 1954 proceeding. The Bill in that proceeding was not a fair indication that anything other than the status of Miss Capen's life estate or the distribution of Emma L. Chapman's estate, *if no such life estate was found to exist,* was to be decided. The contingent remaindermen had no notice from the pleadings that the distribution of Mrs. Chapman's estate, *upon the termination of the life estate granted to Miss Capen,* was to be decided.

In Buswell v. Wentworth, et al., 134 Me. 383, 391, 186 A. 803, 808 (1936), this Court cited Whitehouse Equity Practice (1915), Vol. I, Sec. 408, for the rule that

"A decree in equity can grant only such relief as is justified by the allegations and the evidence. The Court will only decree on the case made by the pleadings even though the evidence may show a right to a further decree. A decree granting relief outside the issue raised by the [p]leadings is a mere nullity and open to collateral attack."

See also In re United States Trust Co. of New York, 237 App.Div. 625, 262 N.Y.S. 394 (1933), modified in 262 N.Y. 284, 186 N.E. 787 (1933).

Since the Justice in the 1954 decree, in ruling upon the distribution at the termina-

tion of the life estate, decided an issue not raised by the pleadings and an issue not essential to the issues raised by the pleadings, we hold that decision to be of no binding effect in the instant case.

The second issue before this Court then, is the construction of the Will and Codicils of Emma L. Chapman to determine who takes the remainder of her estate.

 It is well established that the Law Court must interpret this Will by determining the intent of the testatrix. Thaxter v. Fry, Me., 222 A.2d 686 (1966); Bradbury v. Jackson, 97 Me. 449, 54 A. 1068 (1903). Her intention must be gathered from the whole Will and in the light of circumstances surrounding the testatrix and known to her when the Will was made. Tucker v. Nugent, 117 Me. 10, 102 A. 307 (1917).

The first question in construing the Will of Emma L. Chapman and the codicils thereto is the effect of the first codicil written in March of 1946. A brief summary of the family history prior to the writing of the first codicil reveals the following facts. Mr. Chapman had died in 1935. The terms of his Will were, briefly, the creation of a life estate in his home in Bethel for his wife, daughter, and Miss Capen with the remainder of his estate dedicated to the maintenance of the home during the period of the life estates. Distribution, at the conclusion of the life estates, was to be according to the following formula, one-half of the remainder to his heirs-at-law and one-half of the remainder to the heirs-at-law of his wife.

 Mrs. Chapman wrote her Will nine years after the death of her husband. The dispositive plan (Article Eighth) did not parallel that of her husband as her estate was to be distributed to her heirs exclusively. The question then becomes, did she intend to alter this dispositive plan when she wrote the first codicil. We hold that she did not.

The introduction of the first codicil states

" . . . I now desire to make certain definite provisions in regard to the maintenance of my home in said Bethel, especially in providing for my daughter, Cornelia B. Chapman, and in appreciation of the faithful services of those who have cared for my household through many years."

Thus the intent of Mrs. Chapman in writing the first codicil is clearly set forth. She was concerned, because she knew the estate of her husband was exhausted save for the homestead, that the home her husband intended to provide for Cornelia and Miss Capen would fail. Her intent was to insure that such a home would exist. Therefore, she directed that her estate be committed to maintaining the homestead for her daughter and for the daughter's companion. Nothing in this statement of purpose indicates any desire to alter her plans for the ultimate disposition of her estate.

The third paragraph of the codicil contains the words "When *all* is *over,* the entire Estate can be sold and the receipts divided between Mr. Chapman's relatives and mine pro-rata . . . ." This language merely confirms the Will of Mr. Chapman. The reference to the "Estate" is a reference to the homestead, not an inclusion of Mrs. Chapman's personal estate. That this is true is apparent from other portions of her Will and codicils.

"The intention of the testator in one particular paragraph, if not entirely clear, may be ascertained when other paragraphs or clauses are considered and their bearing and relation one with another, taken into account." In re Estate of Brown, 86 Me. 572, 579 (1894).

In Article Second of her second codicil Mrs. Chapman referred to "my estate" indicating that when she was concerned with her personal estate rather than the home-

stead, which was the estate of her husband, she used the personal adjective "my." [3]

In the first paragraph of the first codicil Mrs. Chapman stated, "I would like Judkins to remain and look after the house and Estate, rentals, etc.—." This is clearly a reference to the homestead, not to Mrs. Chapman's personal estate. A later use of "Estate" in the same instrument should be given an identical meaning unless a contrary intention is clearly shown.

It follows, when Mrs. Chapman wrote that "the entire Estate can be sold" she was again reaffirming her husband's intention that the homestead be maintained intact for the benefit of the stated life beneficiaries.

The intent of Emma L. Chapman in publishing the first codicil to her Will, to which intent we must give effect, was to expand the trust established under Article Seventh of her Will [4] to provide for the maintenance of the homestead in Bethel as a home for Cornelia and for her companion, Alice Capen. Mrs. Chapman exhibited no intent to alter the disposition of the remainder of her estate as set forth in Article Eighth of her Will.

We also note that, in the second codicil to her Will, Mrs. Chapman made specific changes in her original Will not related to the disposition of her residuary estate. In all other respects she ratified and confirmed her original Will. She thereby indicated that she saw nothing inconsistent as between her Will and the first codicil thereto, thus reinforcing the intention which was manifested in the residuary clause of her Will.

The final question then is, who takes under Article Eighth which states:

" . . . to my heirs-at-law then living, in order of their right of representation, per stirpes?"

■ We must first determine when Mrs. Chapman intended that the class of beneficiaries close. Under the residuary clause of her Will, the class would have closed upon the death of her daughter. We have found that by the first codicil to her Will, Mrs. Chapman committed her estate to provide a home, for life, for Alice Capen. Her estate was then subject to a present interest until the death of the survivor of Cornelia Chapman and Miss Capen. Since the two life estates created were co-equal, it is apparent that Mrs. Chapman intended that both have the same effect on her estate. The estate was to be distributed after the death of the survivor of Cornelia and Miss Capen. By using the words "then living" in her residuary clause, Mrs. Chapman intended that the class of beneficiaries was to close at the same time provided for distribution, i. e., the death of the survivor of Cornelia and Miss Capen.

The next determination then becomes "Who are the remaindermen?" One potential construction is that Mrs. Chapman intended to give interests to her "heirs-at-law" as determined under 18 M.R.S.A. § 1001(6).

■ We do not accept such a construction. We first note the use of the words "in order of their right of representation, per stirpes." A per stirpal distribution intends that the more remote descendant share in the distribution through the share of his ancestor. This would not be possible in the instant case if 18 M.R.S.A. § 1001(6) were applied and thus the use of these particular words by Mrs. Chapman would be rendered of little or no meaning.

3. She also referred to "my estate" in Article Seventh of her Will. Note 4, infra.

4. *Article Seventh:* I give, bequeath and devise all the rest, residue and remainder of my estate, of every nature, real, personal and mixed, wherever the same may be found, however situated and whenever acquired, to . . . to have and to hold the same in trust for the use and benefit of my daughter, Cornelia B. Chapman . . . .

Next, the term "heirs" is not to be given a strict legal interpretation when used in a context that indicates a contrary intent. Lord v. Bourne, 63 Me. 368, 380 (1873). By using the words "representation" and "per stirpes," Mrs. Chapman indicated an intent that something other than a strict application of the statutes was to control the distribution of her estate.

Consequently, in order to give the fullest import to the language used in her residuary clause, we order that the estate of Emma L. Chapman be divided into 36 equal shares and that it be distributed in the following manner: 1 share to Laura Jane Bissell; 1 share to James W. Bissell; 1 share to Harriet P. Haspell; 3 shares to Sanford F. Bissell; 3 shares to Gertrude B. Whitman; 3 shares to George Francis Bissell; 3 shares to Michael Reed; 3 shares to Charles S. Reed III; 3 shares to Barbara R Seidenberg; 3 shares to Margot Sisler and 12 shares to Elizabeth Corson.

The case is remanded to the Superior Court for the allowance of counsel fees and expenses.

All Justices concurring.